1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE SOUTHERN DISTRICT OF TEXAS

3                            HOUSTON DIVISION

4  UNITED STATES OF AMERICA        §      CASE NO. 4:24-CR-00543-9
                                   §      HOUSTON, TEXAS
5  VERSUS                          §      WEDNESDAY,
                                   §      MARCH 5, 2025
6  MARKY BAKER                     §      10:02 A.M. TO 11:07 A.M.

7
                            **DETENTION HEARING**
8
                  BEFORE THE HONORABLE YVONNE Y. HO
9                  UNITED STATES MAGISTRATE JUDGE

10

11         APPEARANCES:                    SEE NEXT PAGE
           CASE MANAGER:                   RACHEL WILLBORG
12         COURT RECORDER:                 ANTONIO BANDA

13

14 **THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER
   THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED
15 BY COURT ORDER.   UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
   ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND
16 ONE COPY AT THE OFFICIAL RATE.   General Order 94-15, United
   States Court, Southern District of Texas.**

17

18

19

20                   TRANSCRIPTION SERVICE BY:

21            JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                  935 Eldridge Road, #144
22                 Sugar Land, TX 77478
                      281-277-5325
23              www.judicialtranscribers.com

24

25       Proceedings recorded by electronic sound recording;
         transcript produced by transcription service.

1                          **APPEARANCES**:

2

3   FOR THE PLAINTIFF:           U.S. ATTORNEY'S OFFICE
                                 Byron Hugh Black
4                                Kelly Zenon-Matos
                                 1000 Louisiana St., Suite 2300
5                                Houston, TX  77002
                                 1-713-567-9734
6

7
    FOR THE DEFENDANT:           ATTORNEY AT LAW
8                                James Stafford
                                 515 Caroline Street
9                                Houston, TX  77002
                                 1-713-228-3600
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                              **INDEX**

2

3    WITNESS:                Direct    Cross    Redirect    Recross

4    GOVERNMENT'S:

5    JOSHUA LYONS
      By Mr. Black           6          .         38           .
6     By Mr. Stafford        .          26        .            42

7

     DEFENDANT'S:
8
     MEGAN COLEMAN
9     By Mr. Stafford        45         .         56           .
      By Mr. Black           .          54        .            .
10

11
     EXHIBITS:                         Marked    Offered    Receive
12
     GOVERNMENT'S:
13
     Ex. 102                                     10         10
14   Ex. 148                                     23         25
     Ex. 149                                     23         25
15   Ex. 150                                     23         25
     Ex. 151                                     23         25
16   Ex. 152                                     23         25
     Ex. 153                                     23         25
17   Ex. 154                                     23         25
     Ex. 155                                     23         25
18   Ex. 156                                     23         25
     Ex. 157                                     23         25
19   Ex. 158                                     23         25
     Ex. 159                                     23         25
20   Ex. 160                                     23         25
     Ex. 161                                     23         25
21

22   DEFENDANT'S:
     None
23

24                              ***

25

                        JUDICIAL TRANSCRIBERS OF TEXAS, LLC

4

1        **HOUSTON, TEXAS; WEDNESDAY, MARCH 5, 2025; 10:02 A.M.**

2            THE COURT:  Calling Case 24-cr-543-9, *United*

3  *States versus Marky Baker*.

4            Take appearances.  Who is here for the United

5  States?

6            MR. BLACK:  Good morning, Your Honor.  Byron Black

7  for the Government.  And --

8            MS. ZENON-MATOS:  Kelly Zenon for the United

9  States, Your Honor, ready to proceed.

10           MR. STAFFORD:  And James Stafford on behalf of

11  Mr. Baker.

12           THE COURT:  Good morning, Mr. Black, Ms. Zenon,

13  Mr. Stafford, and Mr. Baker.

14           We are here for a detention hearing in this

15  matter.  Before -- I assume that we're -- we -- the parties

16  are ready to proceed.

17           MR. BLACK:  We are.

18           MR. BAKER:  Yes, ma'am.

19           THE COURT:  Okay.  In my experience, these

20  proceedings have gone on longer than they needed to so I'm

21  putting everybody on the clock.

22           You know, I'll give the United States 40 minutes

23  to present their evidence, which I think should be ample

24  time.

25           MR. BLACK:  I'm sorry, Your Honor, how long?

1          THE COURT:  Forty minutes.  And I've got a timer

2   right here, okay.

3          MR. BLACK:  Understood.

4          THE COURT:  All right.

5          MR. BLACK:  Actually, while I'm on that issue, so

6   one thing that we intended to bring up today regarding

7   timing is the fact that this is -- as the Court knows, this

8   is a presumption case.

9          And in this case we do not know if Mr. Baker has

10  any information to present to rebut the presumption.  We

11  understand we still have an obligation to present some

12  information.

13         But I think if he does not have any information or

14  sufficient information to rebut it, we would propose to

15  proceed by proffer rather than by testimony to provide that

16  record.  That will be our proposal depending on the status

17  of rebuttal.

18         THE COURT:  Well let me first ask Mr. Stafford

19  what sort evidence or proffer do you intend to make on

20  Mr. Baker's behalf to --

21         MR. STAFFORD:  Judge, I plan --

22         THE COURT:  -- rebut the presumption?

23         MR. STAFFORD:  Excuse me, I didn't mean to

24  interrupt you.

25         His wife is coming.  She got tied up on the

1   freeway.  I'm going to put her on the stand to testify to

2   give the Court some back history of where he's living,

3   danger, risk of flight, that type of information.

4           THE COURT:  I mean, I think --

5           MR. STAFFORD:  I don't plan to proffer her.  I'm

6   going to do it with live testimony.

7           THE COURT:  Okay.  All right.  Well, in that case

8   why don't we just go ahead?  I'll give you all 40 minutes.

9           All right.  Be seated.

10          You may call your first witness.

11          MR. BLACK:  Thank you.

12          Your Honor, Government calls TFO Joshua Lyons.

13          JOSHUA LYONS, GOVERNMENT'S WITNESS, SWORN

14                      DIRECT EXAMINATION

15  BY MR. BLACK:

16  Q    So first of all, TFO Lyons, would you please state and

17  spell your name for the record?

18  A    Joshua Lyona, J-O-S-H-U-A L-Y-O-N-S.

19  Q    And, TFO Lyons, can you just briefly summarize your

20  career in law enforcement for us?

21  A    State police 2007 to present day, currently a

22  lieutenant assigned as a task force officer to the FBI

23  Houston Safe Streets Task Force where I've been since

24  approximately 2010.

25  Q    And during your time in law enforcement, have you had

1  occasion to investigate various outlaw motorcycle gangs,

2  including the Bandidos?

3  A    Yes, sir.

4  Q    And in doing so have you become familiar with that

5  organization and other outlaw motorcycle gangs?

6  A    Yes, sir.

7  Q    So in this case we're going to try to move quick here.

8  Can you just give us -- especially since this Court's heard

9  this multiple times -- quick summary for the record of the

10  Bandidos?

11  A    Bandidos is an outlaw motorcycle gang as designated by

12  the government.  And it is a paramilitary organization,

13  operates under a set of bylaws and rules, designated as a

14  one percent due to the patch that they fly, and a red and

15  gold color scheme.

16  Q    And the Bandidos, do they have a presence here in the

17  Houston metropolitan area?

18  A    This is where they were created.  And they probably --

19  they have anywhere at times between 11 and 17 chapters in

20  the Houston area.

21  Q    And what sort of criminal activities based upon your

22  training and experience and all through this investigation

23  do the Bandidos engage in?

24  A    Murder, attempted murder, aggravated assault,

25  aggravated robbery, arson, narcotics trafficking, firearms

1  trafficking, witness intimidation to name a few.

2  Q    So I want to turn your attention -- well, actually a

3  little bit too fast here.  Before we get to Mr. Baker here,

4  the Defendant, let's set the stage for what we're about to

5  talk about, and that it's my understanding the Bandidos have

6  a number of rivals, including one in particular in the

7  Houston area, that is the Beast outlaw motorcycle gang; is

8  that correct?

9  A    Yes, sir.

10 Q    Can you tell us about that rivalry?

11 A    The Brothers East at the time called a motorcycle club

12 was formed in 2015; basically sponsored and given permission

13 by the Bandidos to form.

14     The Bandidos use them as like an enforcer muscle group

15 to help establish their dominance in the area without

16 getting their hands dirty.

17     Over time Beast decided to break off for various

18 reasons.  And they basically declared independence and

19 started flying their Texas bottom rocker, which was a no-no

20 to the Bandidos, and then ultimately a one percent patch,

21 which was a no-no to the Bandidos.

22     That led to an outbreak of hostilities that has

23 increased to present day, multiple murders and other

24 violence.

25 Q    And what is the current state of relations between the

JOSHUA LYONS - DIRECT BY MR. BLACK                    9

1  Bandidos and Beast?

2  A    It's still a turf war.

3  Q    So the warring violence, it's active and ongoing.

4  A    Yes, sir.

5  Q    So let's turn to the Defendant here, Mr. Marky Baker.

6  During your investigation of Bandidos have you become

7  familiar with Mr. Baker?

8  A    Yes, sir.

9  Q    Can you tell us about I guess kind of in general his

10 association with the Bandidos?

11 A    When he first came across our radar, it was at a

12 sergeant at arms position within the Baytown chapter, which

13 is referred to under nickname as the slaughterhouse chapter.

14     Then for the -- one of the primary crimes under this

15 RICO indictment was at the Hawg Stop.  And he was the

16 chapter president, had been promoted to the chapter

17 president of the Baytown or slaughterhouse chapter.

18 Q    And how do you know all of this?

19 A    By surveillance, by social media research, by basically

20 looking at his cut, which the cuts of a Bandido will tell

21 you everything about them, their chapter, their rank, how

22 long they've been in, violence they've committed.  It's a

23 story in itself.

24         MR. BLACK:  Your Honor, may I approach the

25 witness?

 1            THE COURT:  Yes, you may.

 2  BY MR. BLACK:

 3  Q    So, TFO, I'm showing you now what's been marked for

 4  identification as Government's Exhibit 102; do you recognize

 5  this?

 6  A    Yes, sir.

 7  Q    How do you recognize this?

 8  A    It's a picture that we retrieved on social media of

 9  Marky Baker.

10  Q    And is this a fair and accurate copy of that

11  photograph?

12  A    Yes, sir.

13  Q    And do you recognize the individual as a -- in that

14  photograph as Mr. Baker?

15  A    Yes, sir.

16            MR. BLACK:  Your Honor, Government offers Exhibit

17  102.

18            MR. STAFFORD:  No objections.

19            THE COURT:  All right.  Government's Exhibit 102

20  is admitted.

21       (Government's Exhibit Number 102 received in evidence.)

22            MR. BLACK:  So we only have the one copy here.

23  BY MR. BLACK:

24  Q    But I guess just for the record so it's clear, can you

25  just orient us on that photograph about the time period of

 1  it?

 2  A    It was before the shooting, assault, shooting, and

 3  murder at the Hawg Stop because Marky Baker was still

 4  sergeant at arms at the Baytown chapter, which clearly says

 5  that from the tabs and patches that are on his cut.

 6  Q    And let's move forward here and let's actually talk

 7  about that September 26, 2020 shooting and murder.  Are you

 8  familiar with the incident at the Hawg Stop --

 9  A    Yes, sir.

10  Q    -- on September 26, 2020?

11  A    Yes, sir.

12        THE COURT:  Hang on one second.  Can you hand me

13  the exhibit?

14        THE WITNESS:  Yes, ma'am.

15        MR. BLACK:  I apologize.  Sorry.

16  BY MR. BLACK:

17  Q    So give us kind of an overview of what happened at Hawg

18  Stop on September 26, 2020, and then we'll dive into the

19  Defendant's role.

20  A    Some Beast members arrived to the Hawg Stop to watch a

21  beauty pageant, referred to as Miss Hawg Stop.  And a

22  Bandidos member arrived and took issue with Beast being

23  there.  There was some discrepancy on who had a right to the

24  bar.

25        In the biker world, some bars are considered, hey, this

JOSHUA LYONS - DIRECT BY MR. BLACK                    12

1   is our bar, etcetera.  So there was -- the Bandidos believed

2   the Hawg stop was a Bandidos bar and the Beast being there

3   was disrespectful.

4        So this Bandidos member called numerous Bandidos to

5   come up there and so that they could confront Beast, which

6   they did.

7        The first confrontation ended somewhat peacefully with

8   an agreement everyone stay away from each other.  More

9   Bandidos showed up.

10       There was a second confrontation.  The Bandidos

11  initiated an assault and a Beast member was assaulted.  They

12  were trying to steal his cut.  Gunfire erupted and the

13  victim was killed.

14  Q    So you kind of -- you gave us an overview of all this.

15  How was law enforcement able to determine what happened at

16  Hawg Stop on that date; how'd you get all this?

17  A    Numerous interviews with eyewitnesses, with victims,

18  living victims because, again, there was a Beast member who

19  was assaulted.  There was one that ran away.

20       We were able to recover photographs that were taken of

21  the assault in progress.  We recovered a cellphone video of

22  the actual shooting that happened in progress.

23       Call detail records, surveillance video from the Hawg

24  Stop from a pole camera that had been put up, other

25  investigative measures.

1  Q    Now, during the investigation was it determined how

2  many shots were fired and by whom?

3  A    Six shots were fired in terms of -- there actually may

4  have been more than six.  The victim was shot six times,

5  five from back to front, like he's down on the ground, back

6  to front, and then one entered the front, exited the rear.

7  Q    And then based upon the calibers of the weapons were

8  you able to I guess determine approximately how many

9  firearms may have been involved?

10 A    Yes, sir.  Three.

11 Q    And was at least one shooter identified?

12 A    Yes, sir.

13 Q    And how was that?

14 A    By the video.

15 Q    And who was that?

16 A    The -- a defendant in this case, Roy Gomez.  He goes by

17 Repo.

18 Q    And so fair to say there's still two unidentified

19 shooters who --it's still --

20 A    Yes, sir.

21 Q    -- ongoing?

22 A    Yes, sir.

23 Q    Now, Mr. Baker, he was involved in this incident at

24 Hawg Stop, the assault and the murder, correct?

25 A    Yes, sir.

1  Q    Tell us about his specific role in that.

2  A    From our investigation the first arriving Bandidos

3  member made a series of phone calls, called numerous

4  Bandidos trying to get people up there.

5       One of the Bandidos he called was per our phone records

6  analysis research investigation was Marky Baker.  Marky

7  Baker shows up.  We have that on his call detail record.

8       We have him on surveillance video arriving on his

9  motorcycle, pulls around the back.  He meets with other

10 Bandidos -- well, the one that had been there, others.

11      Once they have numerical superiority of eight to three

12 is the number -- Marky Baker's the highest ranking Bandidos

13 there as the chapter president.  So as protocol is, is the

14 highest ranking member will go talk to this other gang,

15 which he did.

16      He went and asked the three Beast members who's your

17 highest ranking member.  Well, there was a chapter president

18 there so chapter presidents will talk to chapter presidents.

19      So they walked off to the side, had a conversation.

20 The other -- everyone else stood around.  The Bandidos

21 formed like a little semicircle kind of waiting on what the

22 outcome was.  Were they going to fight?  Was it going to end

23 peacefully?

24      It ended somewhat peacefully with an agreement to keep

25 your distance from what the investigation showed.  However, --

JOSHUA LYONS - DIRECT BY MR. BLACK                    15

1   Q    And I'm going to --

2   A    I'm sorry.

3   Q    I'll stop you -- yeah, I'll stop you there.  Okay.  So

4   the Bandidos and the Beast are at war at this time; is that

5   right?

6   A    Yes, sir.

7   Q    Yet there's a peace agreement that the Bandidos engage

8   in with the Beast at that bar, despite having a numerical

9   superiority, correct?

10  A    Yes, sir.

11  Q    Based upon your training and experience, why might that

12  be?

13          MR. STAFFORD:  Judge, I object to him speculating

14  as to that.

15          THE COURT:  I'll let you answer as long as you

16  provide some factual basis for it.

17          THE WITNESS:  Yes.  As a matter of fact, people

18  that heard the conversation explained that that peace was

19  made because there was an agreement that there were too many

20  civilians around and that it wasn't the time and the place

21  to engage in war fighting activities.

22  BY MR. BLACK:

23  Q    So what happened next?

24  A    Looked like there was a peace agreement.  Marky Baker

25  and the Bandidos semi-separated.  Maybe an hour went by.

JOSHUA LYONS - DIRECT BY MR. BLACK                    16

1        However, other Bandidos showed up who were known to be
2   part of the SS Crew, which is a violent crew known to be
3   called in to handle war fighting duties.
4        They -- other Bandidos left.  Bandidos got back to
5   about an 11 to three superiority.  The SS Crew reinitiated
6   contact on the Beast members and initiated an assault.
7        And then every -- all the Bandidos and Mascareros
8   jumped on the Beast members.  And that's what led to the
9   shooting.
10  Q    Now, Mr. Baker, he was involved in the assault as well,
11  once the Bandidos initiated, correct?
12  A    Yes, sir.
13  Q    So walk us through what he did.
14  A    When the SS Crew member went back over -- this is the
15  second confrontation.  You know, Mr. Baker led the initial
16  one.
17       The second confrontation was led by an SS Crew member.
18  And all the Bandidos walked over there to back him up.
19  That's standard protocol for them.  And you can see it on
20  the video.
21       Mr. Baker was in the parking lot.  Another SS Crew
22  member saw him there and said -- basically motioned him come
23  on, so Mr. Baker came.
24       And then all the Bandidos just kind of made a little
25  circle, waiting to se what this second confrontation result

1  was going to be.

2  Q    And Mr. Baker was in that circle?

3  A    Yes, sir.

4  Q    Okay.  Proceed.

5  A    Once the SS Crew member initiated an assault and

6  started to fight the Beast member, other Bandidos, including

7  Mr. Baker, rushed.  And I think it was about six on one

8  against one of the Beast victims, including Mr. Baker was

9  one of the six.

10      And then three Bandidos jumped on the other Beast

11  members, so three against one.

12  Q    And then there was I think -- so there were two Beast

13  members that we talked about, and then there -- am I right?

14  There was a third who ended up fleeing.

15  A    There was a third one.  And a Bandido started to go at

16  home and he fled inside the bar around the civilians, almost

17  to shield himself.

18  Q    So tell us about the assault of the Beast victim who

19  Mr. Baker was involved in the attack.

20  A    He almost immediately was down on the ground, being

21  outnumbered six to one.  Was -- stayed on the -- or pretty

22  much on the ground the whole time as they were kicking and

23  hitting him, attempting to pull his cut off of him, which is

24  standard in this war, to steal cuts for trophies, bragging

25  rights.

1    From the photos and the video, Mr. Baker ends up on the

2    ground on top of him.  I don't know if it's in a headlock or

3    just, you know, hitting.  Mr. Baker stays on top of him.

4    And then the shooting rings out, erupts.  Mr. Baker

5    stands up and takes off, ultimately runs to his motorcycle

6    and leaves the scene before EMS and law enforcement arrive.

7    Q    And you indicated that that victim that Mr. Baker and

8    the others were assaulting and who was ultimately shot, he

9    died from his wounds.

10   A    Yes, sir.  There at the scene.

11   Q    And the individual who -- the one for sure fired shots

12   at the victim, that was another Bandido, you said Roy Gomez.

13   A    Yes, sir.

14   Q    So following this I know there was a bunch of

15   investigation into the various parties, including Mr. Baker,

16   and that there was a search warrant executed at Mr. Baker's

17   residence I think November 10, 2020; --

18   A    Yes, sir.

19   Q    -- does that sound right?

20   A    Yes, sir.

21   Q    Can you tell us about that?

22   A    We were able to obtain federal search warrants on the

23   suspects we had identified.  We executed the search warrant

24   at Mr. Baker's residence.  He was not home at the time.  His

25   roommate was, who we spoke with, who indicated Mr. Baker was

1    in Austin, he thought.

2        We were able to locate two firearms and a small bag of

3    what we believe to be crystal methamphetamine inside Mr.

4    Baker's room, along with his Bandidos, you know, cuts,

5    paraphernalia, other items and then per the search warrant.

6    Q    Now, at that time, now so continuing, was Mr. Baker

7    eligible to lawfully possess firearms in the United States?

8    A    He was not.  He was a multiple times convicted felon.

9    He was actually still on parole from the Texas Department of

10   Criminal Justice.  He was on parole during the Hawg Stop and

11   on parole when we executed the federal search warrant at his

12   house.

13   Q    And was the possession of those items also a violation

14   of his conditions of parole?

15   A    Conditions of parole, federal, state law.

16   Q    Then on November 19, 2020 was Mr. Baker arrested for

17   various parole violations?

18   A    Yes, sir.  He had already had some technical violations

19   from parole for not abiding by the terms of his conditions.

20   And we had notified them as well about that he was under

21   investigation for murder, assault, etcetera at the Hawg

22   Stop.

23       And then we let them know about our findings at the

24   house.  So a parole warrant was issued.  We were able to

25   serve it a few days later at the residence.

JOSHUA LYONS - DIRECT BY MR. BLACK                              20

1  Q    And he ultimately was arrested on that.

2  A    Yes, sir.

3  Q    Now we're going to talk very briefly about a May 13,

4  2021 incident at Glamour Girls --

5  A    Yes, sir.

6  Q    -- do you recall that?

7  A    Yes, sir.

8  Q    And I know Mr. Baker was -- had some presence in this.

9  Can you walk us through it quickly?

10 A    There was a group of Bandidos who were going to attend

11 a meeting, what they call a card game, at a strip club

12 called Glamour Girls off of Hempstead in Houston.

13     They had stopped at a Shell station nearby on 290 and

14 Bingle area to fuel up, get some cigarettes, from what our

15 investigation saw from people that have spoken with us.

16     A Beast member just by the worst of luck happened to

17 drive by, stopped at a stoplight.  Bandidos saw him there,

18 they went after him.

19     A Bandidos member ultimately shot him in the back one

20 time.  He died right there off of his bike right on the

21 freeway.

22     HPD, Houston Police Department, responded pretty

23 quickly, located a pack of Bandidos that had been at the

24 Shell station where the shooter and some people had given

25 chase from that pack.  They located the pack at the parking

1  lot of the Glamour Girls, and one of them was Mr. Baker.

2  Q    Is anything further known about his involvement at that

3  -- at this time?

4  A    Nothing at this time.

5  Q    And was he a member of the Bandidos at that time?

6  A    Yes, sir.  He was still.

7  Q    Now, regarding Mr. Baker's status with the Bandidos,

8  does he remain a member of the Bandidos?

9  A    No, sir.

10  Q    Can you tell us about that?

11  A    He was exed out or eighty-sixed as they call it, put

12  out in bad status for supposedly stealing from their gang,

13  organization, violating their rules, their bylaws.

14  Q    And about when was that approximately?

15  A    Not too long after the incident there that you just --

16  we just spoke of in May of 2021, maybe a few months later.

17         MR. BLACK:  Understood.  So we're going to move

18  forward to almost present day here.

19  BY MR. BLACK:

20  Q    So on February 19, 2024, I'm aware that law enforcement

21  both executed an arrest and a search warrant for the arrest

22  of Mr. Baker and also a search of his residence; is that

23  right?

24  A    Twenty twenty-five.

25         MR. BLACK:  Thank you.

1              THE WITNESS:  Yes.

2              MR. BLACK:  Yeah.  Good catch.

3              THE WITNESS:  No.  I don't remember where I was on

4    February 19, 2024.  But, yes, sir, we --

5    BY MR. BLACK:

6    Q    On -- yeah, February 19, 2025.  So --

7    A    Yes, sir.

8    Q    -- tell us about his arrest and the search of his

9    residence.

10   A    We -- I wasn't present.  I was in the -- our command

11   post, so to speak.  A team went and arrested Mr. Baker.

12        Actually he wasn't home.  He was on his way back so

13   they were able to contact him in a vehicle as he was coming

14   back to the residence and serve the arrest warrant.

15        A search of his house, inside of his room located

16   multiple firearms, two under his pillow, and one kind of

17   concealed in an air vent.

18        And then also located several grams of a crystal

19   substance believed to be methamphetamine, as well as some

20   Bandidos paraphernalia he had not turned in.

21   Q    And, again, Mr. Baker cannot lawfully possess firearms;

22   is that accurate?

23   A    Yes, sir.

24             MR. BLACK:  Your Honor, may I approach the

25   witness?

JOSHUA LYONS - DIRECT BY MR. BLACK                    23

 1              THE COURT:  You may.

 2   BY MR. BLACK:

 3   Q    TFO, I'm showing you now a stack of photographs.

 4   They're marked for identification as Exhibits 148 through

 5   161.  Do you recognize these photographs?

 6   A    Yes, sir.

 7   Q    How do you recognize them?

 8   A    These are taken by the search team that executed the

 9   search warrant at Marky Baker's residence.

10   Q    And are they fair and accurate copies of those

11   photographs?

12   A    Yes, sir.

13              MR. BLACK:  Government offers Exhibits 148 through

14   161.

15       (Pause)

16              MR. STAFFORD:  No objection, Judge.

17              MR. BLACK:  Are they admitted?

18              THE COURT:  Yes.  I mean, I have to look at them,

19   but --

20              THE WITNESS:  Would you like to look at them

21   first?

22              THE COURT:  No, no, go ahead.  Explain what they

23   are and then I'll take a look at them.

24              THE WITNESS:  Yes, ma'am.

25   BY MR. BLACK:

JOSHUA LYONS - DIRECT BY MR. BLACK                    24

1  Q     Just kind of give us a quick explanation of what we see

2  in those and then --

3  A     Exhibit 148 is various items inside of Marky Baker's

4  room, one of them being a glass pipe that is commonly used

5  to smoke methamphetamine.

6       Exhibit 149 is a drawer inside the room of Marky Baker

7  that inside we found a pistol and -- yeah, it was just a

8  semiautomatic pistol it looks like.

9       Exhibit 150 are the two semiautomatic pistols that were

10  under the pillow of Marky Baker's bed.

11       Exhibit 151 is a firearm just propped up against the

12  wall inside the room.

13       Exhibit 152 is a black bag inside Marky Baker's room

14  that inside had several grams of a crystal substance

15  believed to be methamphetamine.

16       154 is Marky Baker's Bandidos cut which he told us in

17  his interview after his arrest that he never turned in.  He

18  was supposed to but he didn't turn into the Bandidos I mean.

19       Exhibit 155 is some more methamphetamine or crystal

20  substance we believed to be methamphetamine, and some yellow

21  pills that we believed to be consistent with Oxycontin.

22       156 is a picture of an air vent in his room.

23       157 is the air vent with the vent taken off that inside

24  is Exhibit 158, a condensed shotgun with two pistol grips

25  with the shells mounted on the side.

1       Exhibit 159 and 160 is a notebook, what looks like

2   numerous credit card numbers, zip codes, expiration dates,

3   and security codes on the back that we believe might be

4   indicative of credit card abuse.

5       And then Exhibit 161 is a high capacity magazine for a

6   pistol that looks like it would hold over 20 rounds.

7               MR. BLACK:  Thank you.

8               And would you with the Court's permission be able

9   to provide those to the Court?

10              THE COURT:  All right.  Let me make sure I've got

11  all of them.  One fifty -- okay.  Court will admit

12  Government's Exhibit 148 to 161.

13      (Government's Exhibits Numbers 148, 149, 150, 151, 152,

14  153, 154, 155, 156, 157, 158, 159, 160 and 161 were received

15  in evidence.)

16              MR. BLACK:  Thank you, Your Honor.

17  BY MR. BLACK:

18  Q   So last of all, TFO, it's my understanding that

19  Mr. Baker was interviewed following his arrest after being

20  warned of his rights.

21  A   Yes, sir.

22  Q   Can you give us kind of short summary of the highlights

23  of that?

24  A   He admitted he was at the Hawg Stop, put himself there;

25  admitted that he went and talked to the Beast member and

JOSHUA LYONS - DIRECT BY MR. BLACK                    26

1   that they had made a peace agreement.

2        He stated that other Bandidos showed up and initiated a

3   second confrontation and that he was -- he had a different

4   version of events about why he was in the assault group, but

5   put himself there.

6        And then admitted that he had a methamphetamine problem

7   and that there was methamphetamine back in his room, and

8   that there were firearms in the room as well that he claimed

9   he had for protection.

10  Q    And the version of events that Mr. Baker provided, was

11  it consistent with the video and photograph evidence that

12  you have?

13  A    No, sir.

14          MR. BLACK:  I think those are all the questions I

15  have for you, TFO.

16          MR. STAFFORD:  Please the Court.

17          THE COURT:  Yes, you may.

18          MR. STAFFORD:  Agent, how are you this morning?

19          THE WITNESS:  I'm good, sir.  How are you?

20                        CROSS-EXAMINATION

21  BY MR. STAFFORD:

22  Q    So I've watched the video several times from the Hawg

23  Stop.

24  A    Yes, sir.

25  Q    And it shows my client, as you mentioned, going up and

1    talking to one of the Beast members.  And when you

2    interviewed my client -- and you acknowledged on your direct

3    that they made peace.

4    A    Yes.

5    Q    Or had this bikini contest going on.

6    A    Yes.

7    Q    And they were just -- I think the Beast were out on the

8    outside patio -- pardon me.  The Bandidos were on the

9    outside patio, and the Beast and the girls were inside the

10   club, if I recall.

11   A    Pretty similar to that, yes.

12   Q    And quite some times -- and we know also, as you

13   stated, that some other bikers showed up.  And we know from

14   your investigation and phone records my client didn't call

15   anybody.

16   A    No, sir.

17   Q    Okay.  So we know that.  So whoever the guys that

18   showed up, he didn't call them to tell them to show up.

19   A    Well, he -- I'm sorry.  He had called some other

20   Bandidos up there to -- like, for example, he called his --

21   you know, he was the chapter president.  He called --

22   Q    Right.

23   A    -- his sergeant at arms to come up there --

24   Q    Okay.

25   A    -- to back him up.

1   Q     Okay.

2   A     He did not -- I don't have a record of calling the two

3   other SS Crew members.  You're right on that.

4   Q     Sure.  Okay.  So we had peace.  Then the next thing I

5   recall, the other guys show up and John Pfeffer, --

6   A     Yes, sir.

7   Q     -- he's the one that confronted --

8   A     Yes, sir.

9   Q     -- the guy.  And they walk off about 20 or 30 yards,

10  right?

11  A     Yes, sir.

12  Q     Away from the deck, away from the club.

13  A     Yes, sir.

14  Q     And they sat there have a conversation for 30, 45

15  seconds.  And then all of a sudden Pfeffer hits the guy

16  right in the mouth.

17  A     Yes.

18  Q     Knocks him down.

19  A     Yes.

20  Q     He jumps up and hits Pfeffer.  Pfeffer backed off.  And

21  then that's when everybody starts rushing down from the

22  deck.  So there was not a circle of Bandidos around Pfeffer

23  and the guy when they were back there sitting there talking.

24  A     There wasn't a circle around them.  All the Bandidos

25  were waiting by the cattle guard gate or I'm not sure, some

 1  kind of metal pole all waiting to see what happened.

 2      And the victim never punched Pfeffer back.  He was

 3  jumped in the back before he got to swing.

 4  Q   What I recall -- say you and I were going and having a

 5  conversation.  Bandidos would be back somewhere back where

 6  -- kind of the backrow, were watching.

 7  A   I wouldn't say that far, no, sir.

 8  Q   Okay.  Well, (indiscernible.

 9  A   I'd say maybe second row where the two ladies are.

10          MR. STAFFORD:  I guess the tape would speak

11  better.  I wish I could show it to the Court.

12  BY MR. STAFFORD:

13  Q   Anyway, they have a conversation.  What I recall, he

14  punches him, the guy falls down, and he hits --

15  A   He actually never falls down.

16  Q   The complainant?

17  A   The victim never falls down.  He backs up.  He never

18  falls to the ground.

19  Q   I recall him falling on the ground --

20  A   I've --

21  Q   -- and getting up and hitting Pfeffer.

22  A   I've also seen the video hundreds of times and that

23  doesn't happen.

24          MR. STAFFORD:  So have I.  Okay.  We'll agree to

25  disagree on that issue.

JOSHUA LYONS - CROSS BY MR. STAFFORD                    30

1          THE WITNESS:  Yes, sir.

2    BY MR. STAFFORD:

3    Q    And then when you were interviewing my client, he told

4    you about making peace.  And he also agreed that he ran over

5    there.  And you've confronted him about why he was in the

6    middle.

7          And he told you he was there to separate, that he had

8    made peace.  And he was angry that these guys were jumping

9    on this guy.  He told you he was trying to make peace,

10   correct?

11   A    That's what he said.

12   Q    Okay.  And he wasn't there when the shooting occurred.

13   A    He was right on top of the victim.

14   Q    Okay.  But when -- he was not the shooter.

15   A    We don't have him as firing it this time, --

16   Q    Okay.

17   A    -- no, sir.

18   Q    Do you know whether the complainant, Adam Burns, did he

19   have a gun?

20   A    He had one, yes, sir.

21   Q    Okay.  Did you all recover that?

22   A    Yes, sir.

23   Q    Okay.  Had it been fired?

24   A    Yes, sir.

25   Q    Okay.  So you cannot rule out that he wasn't firing at

1  the Bandidos.

2  A    Cannot rule that out, no, sir.

3  Q    Okay.  And you can't rule out that he wasn't the one

4  that fired first.

5  A    Cannot rule that out, no, sir.

6  Q    Okay.  Only thing you know from talking to my client,

7  that he was there trying to break up the fight, based upon

8  what he told you.

9  A    That's what he said, yes, sir.

10 Q    Is that true?  So in that regard -- and he also told

11 you that he didn't have a firearm that night.

12 A    That's what he said, yes, sir.

13 Q    That's what he told you.  And so we know from the -- in

14 the indictment he's charged with using, carrying,

15 brandishing, discharging, and possession firearm.

16 A    If that's what the --

17 Q    According to the Indictment.

18 A    -- Indictment says, and it might be under the aiding

19 and abetting statute of that charge.

20         MR. STAFFORD:  No, my -- okay.

21         THE WITNESS:  Again, I'm not sure.  I don't have

22 it front of me.

23         MR. STAFFORD:  Okay.

24 BY MR. STAFFORD:

25 Q    Well, we know he wasn't using a firearm that night --

1   A    We --

2   Q    -- based on what he said.

3   A    That's what he said.  We haven't ruled it out.

4   Q    Okay.  You have no evidence that he did.

5   A    At this time.

6   Q    Okay.  And you have no evidence that he was carrying.

7   A    At this time.

8   Q    And you have no evidence that he was banishing.

9   A    Brandishing.

10  Q    Brandishing.

11  A    At this time, yes, sir.

12  Q    Or discharging.

13  A    Yes, sir.

14  Q    Okay.  Or possessing a firearm.  And you had this

15  information for five years and you just got around to acting

16  on it now, correct?

17  A    I would not phrase it like that.  We were trying to get

18  -- we've been working on this federal case since the moment

19  this happened.  It takes some time.

20  Q    Okay.  But he was arrested back then on the parole

21  violation, correct?

22  A    And he's been arrested several times since, --

23  Q    I know.

24  A    -- yes, sir.

25  Q    But my question --

1   A    Oh, okay.  I'm sorry.  I --

2   Q    -- on the 2020 incident, he was arrested, correct?

3   A    For a parole violation, --

4   Q    Right.

5   A    -- yes, sir.

6   Q    And you all tried to interview him and he wouldn't

7   interview.

8   A    Yes, sir.

9   Q    Is that correct?

10  A    Yes, sir.

11  Q    And you were talking about the May the 13th, 2021 at

12  the Shell station.  You can't actually place him at the

13  Shell station.  You just placed him at -- later down the

14  road --

15  A    At the Glamour Girls, yes, sir.

16  Q    -- at the Glamour Girls.

17  A    Yes, sir.

18  Q    But not at the shooting.

19  A    I can't recall if some of our witnesses placed him at

20  the Shell.  But we know he was at the Glamour Girls so, yes,

21  sir.

22  Q    Okay, Glamour.  But we don't know whether he was at the

23  Shell or not.

24  A    I'm not sure, sir.

25  Q    Okay.  But we wanted the Court to know about that.

1  A    Yes, sir.

2  Q    Okay.  All right.  And also during the time that you

3  were interviewing him, you learned that he had had a major

4  motorcycle accident, head injury, and that I think he

5  suffered back in 2015, somewhere in there.

6  A    I'm not sure the date, yes, sir.

7  Q    Okay.  And this has affected him to the degree he's

8  very slow talking.

9  A    Very slow talking, yes, sir.

10 Q    Almost like he's --

11 A    And which I understand, yes, sir.

12 Q    Like he's been drinking or something.

13      (Laughter)

14      Kind of pausing.  And can you tell the judge whether

15 you said he -- you have information that he left the club.

16 Have you discovered any social media at all since 2021 to

17 present that he's been involved in the Bandidos at all?

18 A    No, sir.

19 Q    Okay.  So no -- you examined his phone, you all have

20 his phone, hadn't been reaching out to him.

21 A    The phones we just got, we have not gotten into them

22 yet.  But up to this point, no, sir, we -- since he was

23 excommunicated we have not heard that he's back in.

24 Q    Okay.  Do you know prior to this -- going back still to

25 2020 at the Hawg Stop, has there been any other previous

1  fights other than this one prior to that one?

2  A    Incidents, yes, sir.  Some shootings, assaults,

3  etcetera.

4  Q    No, no, no.  On this night, September the 26th, --

5  A    Oh, I'm sorry.

6  Q    -- 2020.

7  A    I misunderstood you.

8  Q    Had -- was this the first fight at the club that night,

9  to your knowledge?

10  A    Yes, sir.

11  Q    Okay.  There hadn't been any other incidents.

12  A    No, sir.  They're -- from what we saw, we have the

13  video from when they pretty much opened to when the assault

14  and shooting occurred, we didn't see any other incidents nor

15  did we hear about any.

16  Q    Now, addressing the risk of flight, if I may, we know

17  he was there at his house where you all arrested him in

18  2020, about a week after the fact, correct?

19  A    Yes, sir.

20  Q    He was aware that you all had been there and searched

21  his house.  He came back, correct?

22  A    He came back, not to meet us.  But he came back.

23  Q    I understand.

24  A    Yes.

25  Q    And when you all arrived, he had the garage door open,

1   sitting inside the garage.

2   A    Yes, sir.

3   Q    Like he was waiting for somebody.

4   A    He was talking to some friends.  I'm not sure --

5   Q    Okay.

6   A    -- what they were doing.

7   Q    And you all show up.

8   A    Yes, sir.

9   Q    And he didn't offer any resistance.

10  A    No, sir.

11  Q    Okay.  And on this incident, this present arrest, you

12  all break in the door, bust out his windows, have a tank out

13  there looking to arrest him, correct?

14  A    I wasn't out there.  I'm not sure how it went down.

15  Q    What did you hear?  Didn't you hear they had a tank out

16  there and busting in his windows and busting in his doors?

17  A    I don't think it's considered a military tank, sir.

18  I'm not sure what it's called but I don't think it's a tank.

19  Q    It's a big ole thing, isn't it?

20  A    Maybe.

21  Q    Okay.  And there are like 15 to 20 police cars out

22  there.  And he sees them and he still shows up, doesn't he?

23  A    We have no reason to believe he came back to turn

24  himself in.  He was on his way back.  And they had actually

25  departed, the marked units, and were looking to try to

JOSHUA LYONS - CROSS BY MR. STAFFORD                    37

1  locate him.  And he just comes driving up.  And then they

2  have to contact him on the street.

3  Q    Well, you agree with me that didn't take a very big

4  mental giant to realize that when I turn the corner to my

5  house and see about 20 or 30 cars there, that they're

6  looking for me.

7  A    I'm not sure if he was within view of his house.  They

8  knew what car he was in.  They saw it come in the

9  neighborhood.  So I don't think he saw the cars and then

10 decided to come walk up with his hands up.

11 Q    That's your opinion.

12 A    I -- that's what I was told.

13 Q    Okay.  But anyway, he didn't offer any resistance there

14 either, did he?

15 A    No, sir, no resistance.

16 Q    And that's when he came and talked to you, voluntarily

17 gave you a statement.

18 A    Yes, sir.  When we had him transported to the

19 processing center.

20 Q    Okay.  All right.  And this 15 -- 22-count indictment,

21 he's only named in Counts Two and Three.

22 A    I believe so, sir.

23 Q    Okay.

24 A    I'm not going to dispute what you have in front of you.

25             MR. STAFFORD:  I have no other questions, Judge.

1           THE COURT:  Thank you.

2           All right.  Any Redirect?

3           MR. BLACK:  If I could have a couple minutes?

4           THE COURT:  Yes.

5           MR. BLACK:  TFO Lyons, just a couple questions

6    here.

7                        REDIRECT EXAMINATION

8    BY MR. BLACK:

9    Q    Regarding Hawg Stop, how many -- I guess remind us

10   again how many Bandidos were surrounding and assaulting the

11   victim who ultimately perished?

12   A    Can I name them out?  It might be easier in my head, --

13   Q    Yeah.  That's --

14   A    -- if that's okay.  We had John Pfeffer, Roy Gomez,

15   Arvin Bartlett, Texas Josh, Marky Baker, Jeremy Cox, Marcel

16   Lett.  So that would be six.

17   Q    Point here being it was approximately six on one.  Is

18   that --

19   A    Yes, sir.

20   Q    -- roughly accurate?

21   A    Yes, sir.

22   Q    Were there any other Beast members nearby able to aid

23   or assist the deceased victim?

24   A    When the deceased victim was bum-rushed -- well, again,

25   one of the Beast members fled inside.  When the deceased

1    victim was bum-rushed, his other buddy who remained tried to

2    get out there to him.

3        Other Bandidos wouldn't let him, so they intercepted

4    him almost with a football tackle and assaulted him and took

5    off his Beast soft cut t-shirt.  There were three of them I

6    believe on him, so he could never get to his buddy.

7            THE COURT:  Wait, I'm sorry.  Let me see if I have

8    this correct.  You described there was a shooting, right?

9    This is separate from the shooting.  There was an assault of

10   like six on one --

11           THE WITNESS:  There was -- yes, ma'am.  The victim

12   that's being assaulted is ultimately shot.  The --

13           THE COURT:  Oh, same --

14           THE WITNESS:  Yes, ma'am.  So there's a six on one

15   assault and then there's a three on one assault further

16   away.

17           The three on one assault, that victim lives.  They

18   let him up.  The six on one assault, gunfire erupts, and

19   that victim is shot five times -- six times.

20           THE COURT:  And this is -- and so Mr. Baker was

21   involved in this assault on the victim who ultimately was

22   shot by --

23           THE WITNESS:  Yes.

24           THE COURT:  -- one person you've identified and

25   the other two you have not yet.

JOSHUA LYONS - REDIRECT BY MR. BLACK                    40

1          THE WITNESS:  Yes, ma'am.

2          THE COURT:  Okay.  See, I did not catch that.  All

3   right, thank you --

4          THE WITNESS:  I apologize.

5          THE COURT:  -- for the clarification.

6          MR. BLACK:  And I -- that's my fault.  I

7   (indiscernible) --

8          THE COURT:  I assumed it was someone else also,

9   another Bandido -- I mean another Beast member at the scene

10  was shot.

11         MR. BLACK:  Okay.  And I apologize.  It's --

12         THE COURT:  Got it.

13         MR. BLACK:  Yes.  So clear that up.  That's my bad

14  because trying to abbreviate here.

15  BY MR. BLACK:

16  Q    So we have kind of two simultaneous assaults going on,

17  correct?

18  A    Yes, sir.

19  Q    And the one we're really concentrating on is the six on

20  one that Mr. Baker's involved in against the victim who's

21  ultimately shot, correct?

22  A    Yes, sir.

23  Q    And then killed.

24  A    Yes, sir.

25  Q    Now, finally on this point, who -- between Beast and

JOSHUA LYONS - REDIRECT BY MR. BLACK                    41

1  Bandidos, who initiated the assault?

2  A    The Bandidos.

3  Q    Finally, when you interviewed Mr. Baker, you indicated

4  when I asked you that his version of events was inconsistent

5  with reviewing of photographs, video surveillance, and then

6  other evidence gained; is that accurate?

7  A    Yes, sir.

8  Q    How so?

9  A    Well, when the two other Bandidos arrived, who were the

10  SS Crew, Marky Baker meets with them.  And technically Marky

11  Baker is still the highest ranking Bandido there present.

12  He's the chapter president, so he has authority over really

13  everybody.

14      He had already controlled the scene.  He had already

15  made the peace.  So kind of what he says goes.

16      And he meets and spends several times actually at the

17  bar with these new Bandidos who've arrived, outside with

18  them, and basically had the authority and power to tell

19  them, hey, nothing else needs to happen.

20      When they walk back up to talk to the Beast members and

21  they signal Marky to come, Marky comes and just watches and

22  stands there.

23      He doesn't walk up to their conversation and try to

24  break it up then to prevent the violence from occurring in

25  the first place.  He just stands there.

1    And then when the fight breaks off, he doesn't just

2 walk over there.  He runs and then ultimately ends up on top

3 of the victim.

4 Q    And is this just on top of the victim for a brief

5 moment to try to disengage a fight; is it consistent with

6 that?

7 A    No, sir.  It's consistent to being on top of him almost

8 -- and you can see it because the victim's face is mashed

9 against the concrete, and Marky's on top of him in almost

10 like a bearhug.

11         MR. BLACK:  Those are all the questions I have.

12 Thank you.

13         THE COURT:  All right.  Thank you.

14         MR. STAFFORD:  Just a couple questions, Judge, if

15 I may?

16         THE COURT:  Okay.

17                 RECROSS-EXAMINATION

18 BY MR. STAFFORD:

19 Q    If I recall this video that I've seen several times,

20 it's at a distance.  And I'm trying to figure out how did

21 you -- what video is there available showing them at a bar

22 talking?

23 A    Oh, we've got --

24 Q    And how were you able --

25 A    Sorry.

1   Q       -- to identify who in the world those were --

2   A       It's actually very --

3   Q       -- at that distance?

4   A       -- good video -- I'm sorry.  It's very good video from

5   the Hawg Stop from inside the bar.  There's several angles.

6           And we -- and I was able to place all the movements of

7   when Marky Baker arrived on his motorcycle, parked.  And you

8   -- it -- you're basically able to switch camera angles and

9   follow him.

10  Q       Okay.

11  A       And follow him through the bar going outside to meet

12  the Bandidos that arrived.  They're at the bar together

13  ordering beers and drinks, and then walking around the bar.

14  So it's almost like a live action, just changing the camera

15  views.

16  Q       Okay.  And once again, when Pfeffer takes Mr. Burns

17  down to talk to him, --

18  A       Yes, sir.

19  Q       -- there's no indication that my client told him to go

20  down there and talk to him.

21  A       That Mr. Baker told him to do that, no, sir.

22  Q       Okay.  Or that he was even aware at the time that they

23  both walked down there to talk and like they were having a

24  private conversation.

25  A       Well, Mr. Baker saw them because he was --

1  Q    Okay.

2  A    -- told to come over.  And he saw them talking.  That's

3  -- yeah.  I'm not sure if he knew what they were talking

4  about.  But he saw them talking for however long that they

5  were talking.

6  Q    And it wasn't until Pfeffer punches him that everybody

7  starts running down --

8  A    Yes, sir.

9  Q    -- and the struggle starts.

10  A    Yes, sir.

11  Q    Is that correct?

12  A    Yes, sir.

13        MR. STAFFORD:  Okay.  Have no other questions,

14  Judge.

15        THE COURT:  All right.  Thank you very much,

16  Officer Lyons.  You may step down.

17      (Witness steps down.)

18        THE COURT:  All right.  Mr. Black, anything else?

19        MR. BLACK:  Not from the Government, Your Honor.

20        THE COURT:  Okay.  All right.  Mr. Stafford.

21        MR. STAFFORD:  Yes.  I'll call Megan Coleman.

22      (Pause)

23        THE COURT:  Let me just ask you, Mr. Stafford.  Is

24  it your plan to present, you know, live testimony, anything

25  else that you intend to proffer?

MEGAN COLEMAN - DIRECT BY MR. STAFFORD                45

1          MR. STAFFORD:  Yeah.

2          THE COURT:  Okay.  All right.  I'll give you 20

3   minutes.

4          MR. STAFFORD:  Thank you, Judge.

5          THE CLERK:  Will you please raise your right hand?

6          MEGAN COLEMAN, DEFENDANT'S WITNESS, SWORN

7       (Pause)

8          MR. STAFFORD:  Good morning.

9          THE WITNESS:  Good morning.

10          MR. STAFFORD:  Please state --

11          THE COURT:  Can you --

12          MR. STAFFORD:  -- your name for the record,

13   please.

14          THE COURT:  Sorry.  Can you pull the microphone

15   right up to your face?  Otherwise the court reporter cannot

16   hear you.

17          THE WITNESS:  Okay.

18          THE COURT:  Yes.

19          THE WITNESS:  Okay.

20                       DIRECT EXAMINATION

21   BY MR. STAFFORD:

22   Q    Will you state your name for the record, please?

23   A    Megan Coleman.

24   Q    Okay.  And how do you know Mr. Baker?

25   A    That's my boyfriend, fiancé.

1  Q    Okay.  How long have you known him?

2  A    Twenty years, since like 2005.

3  Q    And how long you all been living together?

4  A    Since 2022, I believe.

5  Q    For about approximately three years.

6  A    Yeah, roughly.

7  Q    And can you tell the judge where you live?

8  A    We live --

9  Q    Where do you all live?

10  A    Ninety-one nine Shawnee.

11  Q    And how long have you all lived there?

12  A    Remember, maybe like June, last June, since last June,

13  I believe.

14  Q    I didn't understand you.

15  A    Since last June, I believe.

16  Q    Since last -- about a year.

17  A    Yes.

18  Q    Okay.

19  A    Roughly.

20  Q    And are you all renting or purchasing?

21  A    It's a family-owned home.

22  Q    And when you started living with Mr. Baker, was he a

23  member of the club at that time?

24  A    No.

25  Q    Okay.  And while you've been with him has he had any

1  contact with the club at all?

2  A    No.

3  Q    Okay.  And can you describe to the judge has he been

4  able to work?

5  A    Here and there, little odds and end jobs.  He was doing

6  lawn care there for a while, mechanic work, things like

7  that.  But he's so forgetful, I mean, I can't --

8           MR. STAFFORD:  Let me ask you a question.

9           THE WITNESS:  Okay.

10  BY MR. STAFFORD:

11  Q    Did he have a significant head injury some time in --

12  A    Yes.

13  Q    Okay.

14  A    In 2016, he was --

15  Q    Okay.

16  A    -- pronounced dead on arrival.  He was in a coma for 32

17  days.  He -- they had to teach him how to walk again, talk

18  again, everything.  He was a patient at TIRR, Ben Taub --

19  Q    Okay.

20  A    -- I think for about six to eight months.

21  Q    What kind of accident was it?

22  A    It was a motorcycle accident.  He had severe brain

23  trauma.  They had to cut on the side to prevent the swelling

24  in his brain -- to relieve the swelling.

25  Q    And did he have a subsequent injury as well?

1   A    Yes.  Later on he had another accident.  I'm not sure

2   what year that was in, but he broke his tib and fib in his

3   left leg and they put the metal rods in.

4        But he also hit his head then as well because the

5   helmet was cracked during that accident.  So they don't know

6   how severe the trauma was, but he had a brain contusion as

7   well with that accident.

8   Q    Can you tell the judge since you've been living with

9   him, have you seen a deterioration in his cognitive --

10  A    Yes.

11  Q    -- ability?

12  A    Yes.

13  Q    Okay.

14  A    Yes.  We argue all the time about where he put this or

15  where he put that, or if he told me something.  Or if I told

16  him something, he doesn't remember.  It's just -- it's a

17  constant battle.

18  Q    And were you aware of the Hawg Stop incident?

19  A    No.

20  Q    All right.

21  A    I knew that something had happened but all -- like this

22  is so new.  And the only thing I knew is that he was

23  president of this biker club and he tried to break up a

24  fight.  So that's all we've ever really talked about --

25  Q    Okay.

MEGAN COLEMAN - DIRECT BY MR. STAFFORD                49

1    A    -- about it.

2    Q    And what was your impression of why he left the club?

3    A    Very much disagreed with how they ran things, things

4    that they did.  The people that were in it were just not

5    good people.  And --

6    Q    Okay.

7    A    -- he was tired of the lifestyle.

8    Q    Okay.

9    A    Wanted -- didn't want that.

10   Q    Okay.  And if the judge did set conditions of release

11   for him, --

12   A    Yes, sir.

13   Q    -- what is your opinion about him showing up to court?

14   A    Oh, he will definitely be there, most definitely.  I'll

15   make sure of that.

16   Q    And has he been in Houston all of his life?

17   A    Yes, sir.

18   Q    Okay.

19   A    Yes.

20   Q    And is his family here?

21   A    Yes.  All family's here.

22   Q    He went to school here.

23   A    Yes.

24   Q    Okay.  Can you tell the judge if you know whether he

25   has a passport?

1    A    No, he don't have a passport.

2    Q    Do you know whether he's had any international travel

3    or going --

4    A    Not to my knowledge.

5    Q    -- down to Mexico?

6    A    No.

7    Q    We know from the search of your house there was

8    firearms there.

9    A    Yes.

10   Q    Okay.  You have any idea why he had so many firearms?

11   A    Maybe a little paranoia from the past biker life.  I

12   don't think he left the Bandidos on very good terms.

13   Actually, I know he didn't leave on very good terms.

14       And so he was a little I wouldn't say paranoid but very

15   cautious of that.  When he hears motorcycles, he always is

16   alert, like what is that, what is that, you know.  So maybe

17   a little PTSD even from that era of his life.

18   Q    All right.  Does he have any motorcycles now?

19   A    No.

20   Q    He's given --

21   A    Have no motorcycles at --

22   Q    -- up the motorcycles?

23   A    No.  I don't -- we don't do that.  We don't live that

24   lifestyle.  I have zero tolerance for it.  None.

25   Q    And for the 20 years that you've known him, do you have

1    an opinion about him being a dangerous person or anything of

2    that nature?

3    A    No.  Not at all.

4    Q    If the judge set conditions of release, do you

5    understand he cannot have any firearms --

6    A    Yes, sir.

7    Q    -- in the house?

8    A    Yes, sir.

9    Q    Will you make sure that happens?

10   A    Yes, sir.

11   Q    Okay.

12   A    Absolutely.

13   Q    Okay.  And you know that applies to you all had a

14   roommate or anything like that, --

15   A    Correct.

16   Q    -- they couldn't have any pistols.

17   A    Yes.  We won't have anyone at the house.  It's just

18   going to be us.  And, no, there will not be anything in the

19   house at all.

20   Q    And in your opinion, based on what you know of him, if

21   the judge sets conditions of release, will society be in

22   danger with him being released?

23   A    No, sir.

24   Q    Okay.

25   A    Not at all.

1  Q    Have you talk to anybody that possibly could give him a

2  parttime job if he's released?

3  A    Yes.  His uncle is willing to give him a job at a

4  company that he's worked for previously.  So he said that he

5  could come back there.

6       And then also his brother is -- I don't know the name

7  of the company that has a job offer for him waiting as well.

8  I just know that they do some kind of chemical hydro

9  blasting something.  I don't know --

10 Q    Okay.

11 A    -- exactly what they do.  But it's a big company.  Like

12 they have a welding shop, they have a machine shop, they

13 have a couple different things that he could do.  And he

14 talked to his supervisor and said that, yeah, he was willing

15 to take him.

16 Q    When he was arrested at your house, were you able to

17 see him being arrested?

18 A    Yes.  Well, he pulled up to the house.  So I saw him

19 coming before I guess anybody else would because the truck

20 headlights are pretty distinguishable.

21      So I saw the truck coming down.  And then they stopped

22 him before he even got to the house and I guess arrested

23 him.

24 Q    How many police vehicles were out there?

25 A    Twenty to 30.  A lot.

1   Q    Okay.

2   A    Extreme a lot.

3   Q    So it was rather obvious the police was at your house

4   when he --

5   A    Oh, yeah.

6   Q    Okay.

7   A    To say the least.

8   Q    What kind of heavy tank-like thing do they have?

9   A    They almost look like little mini tanks, like an

10  armored truck but like with the .50 cal. thing on the top of

11  it, like a big gun like you see in the movies, like the big

12  shooter things.  I don't know.  It was pretty traumatic.

13       They busted out all the windows in the house.  They

14  broke my cameras.  Well, they attempted to break the

15  cameras.  They're -- they weren't broken.  But they tried

16  really hard.

17       They broke every window in the house.  They cut down

18  the front gate which is accessible on another side.  This is

19  after they cleared the house, which I couldn't understand.

20  They had a grinder out there.

21       They cut the metal gate.  They broke down the wooden

22  gate on the right side of the house.  And I believe they

23  shot at my dogs because I found the rubber bullets inside

24  our living room.

25  Q    But bottom line is he saw them and he didn't try to

1   flee, correct?

2   A    No.  He --

3   Q    All right.

4   A    -- came to the house like specifically because they

5   were there.

6            MR. STAFFORD:  I have no other questions, Judge.

7            THE COURT:  All right.  Mr. Black.

8            MR. BLACK:  So, Ms. Coleman, just a couple

9   questions here.

10           THE WITNESS:  Okay.

11                          CROSS-EXAMINATION

12  BY MR. BLACK:

13  Q    First of all, remind me again, how long have you known

14  Mr. Baker?

15  A    Roughly 20 years.

16  Q    Twenty years.

17  A    Yes.

18  Q    Okay.  And are you familiar then with his criminal

19  history?

20  A    Yes.

21  Q    All right.  What do you know about his criminal

22  history?

23  A    Pretty much everything.

24  Q    So you know that he has multiple prior felony

25  convictions.

1  A    Correct.

2  Q    And you've lived with him at the Shawnee address since

3  about June of last year; is that right?

4  A    Correct.

5  Q    And you had firearms in the residence, correct?

6  A    Yes.

7  Q    And you're aware that Mr. Baker cannot have firearms

8  because he's a felon.

9  A    Yes.

10 Q    But you allowed those firearms to be in the residence

11 despite that, correct?

12 A    I didn't allow them, no.  I can't control -- I mean --

13 Q    Okay.  Mr. Baker also is engaged in drug use, correct?

14 A    Correct.

15 Q    What do you know about his drug use?

16 A    It's been a battle.  But he's not -- he's a user but

17 not a -- I wouldn't say daily user, just on occasion, to my

18 knowledge.  But he's tried to quit.  It's been a back and

19 forth thing so --

20 Q    What is he using?

21 A    Methamphetamine.

22 Q    And how long has that been going on?

23 A    About I'd say like six to eight months again for this

24 -- because he was sober for a long period.  And then this

25 started roughly about six to eight months ago, I think.

MEGAN COLEMAN - CROSS BY MR. BLACK                    56

1  Q    But you were aware he was using methamphetamine.

2  A    I found out.

3  Q    And were you aware he was using methamphetamine in your

4  residence?

5  A    No.  He was not.

6  Q    Okay.  Where did you think he was using

7  methamphetamine?

8  A    I'm not sure.  In the car.  I mean, I don't know.  Not

9  at the house.

10  Q    Were you with Mr. Baker back in November of 2020?

11  A    No, sir.

12  Q    So you weren't aware of where Mr. Baker was using

13  drugs, just that he was using drugs.

14  A    We had talked about it in the past but, no, I wasn't

15  aware he was using them at, no, not specifically.

16  Q    Were you aware that he had drugs inside of your

17  residence?

18  A    Yes.

19        MR. BLACK:  Okay.  I have no further questions.

20        THE COURT:  All right.  Thank you.

21        MR. STAFFORD:  One last question, Judge, if I may.

22        THE COURT:  All right.  Last one.

23                    REDIRECT EXAMINATION

24  BY MR. STAFFORD:

25  Q    You think this was self-medicating?

1  A    Probably, yes, I do.

2  Q    Because you said he went eight months without using and

3  all of a sudden started using.

4  A    And then started using again, yes.

5  Q    Okay.

6  A    I think once the deterioration of memory and stuff like

7  that like started again, it's just kind of been a spiral.

8  So I don't know if they're related.  You know, I can only

9  say what I see.  And they kind of coincide together so --

10          MR. STAFFORD:  Okay.  No other questions.

11          THE COURT:  Okay.  Thank you.

12          Thank you, Ms. Coleman, you can step down.

13      (Witness steps down.)

14          THE COURT:  All right, Mr. Stafford, any other

15  proffer?

16          MR. STAFFORD:  That's it.  I rest, Judge.

17          THE COURT:  Okay.  Let's proceed to argument.

18          MR. BLACK:  Thank you, Your Honor.

19          Your Honor, as the Court knows, this is a

20  presumption case based on the 924(c) charge.  Really

21  separate and independent from that, however, there just

22  frankly aren't conditions I can see that this Court can set

23  that would reasonably assure community safety.

24          And I think any conditions that this Court tried

25  to set, Mr. Baker is either unable or unwilling to abide by.

1   And that's really demonstrated based upon his prior conduct.

2           Frankly, we can talk about the offense as charged.

3   I think that demonstrates dangerousness in and of itself.

4           But I think we don't even have to because if we

5   look at his criminal record, his prior convictions, as well

6   as the fact that during the course of this investigation,

7   aside from the assault and murder, there have been two

8   occasions where he's had firearms despite the fact he cannot

9   have firearms, one of which was when he was already on

10   parole for another offense.

11           So he has a history demonstrating that he is not

12   going to abide by a Court order or parole or any conditions.

13           The Court's familiar with his history.  It is

14   lengthy.  It contains numerous offenses involving both

15   firearms and controlled substances.

16           In this -- on this arrest, again, we have

17   possession of firearms and controlled substances.

18           I don't think anyone I think is reasonably arguing

19   that Ms. Coleman, despite her I'm sure good intentions, is

20   going to be a good custodian for Mr. Baker.

21           I'll be brief here.  I just -- I can't see that

22   there's any (indiscernible) conditions for this gentlemen.

23   And he needs to be detained pending trial.

24           Thank you.

25           MR. STAFFORD:  And I totally disagree, Judge.  You

1    know, the Government's position on all of these defendants

2    is they all should be detained.

3            And I ask the Court to look at the totality of the

4    indictment.  They have nothing to dispute that he was not

5    being a peacemaker.

6            They have nothing to dispute his statement to the

7    police or the agent that he was there trying to separate

8    them and trying to make peace because he'd made peace.

9            I think the Government has conceded he's not a

10   risk of flight.

11           The only thing they can hang their hat on is they

12   think he's a danger.  They have offered you nothing to show,

13   other than this event, that he is a danger to society or

14   would be a danger.

15           True, he had multiple gun counts that within

16   itself does not particularly make him a danger.  Our Supreme

17   Court and the gun manufacturers, they just -- other than I

18   understand Texas --

19           THE COURT:  He's a prior convicted felon.  I mean,

20   there's --

21           MR. STAFFORD:  I understand.

22           THE COURT:  -- a reason why Congress said, if you

23   have felony --

24           MR. STAFFORD:  Totally agree.

25           THE COURT:  -- conviction, you are -- and even the

1  Supreme Court has said you don't -- it is constitutional

2  prohibit prior convicted felons from having a firearm.

3         MR. STAFFORD:  Totally agree.  He hasn't been

4  charged with that.  And that within itself does not make him

5  a danger, especially if the Court --

6         THE COURT:  I don't agree with that at all.

7         MR. STAFFORD:  Well, I --

8         THE COURT:  Go ahead.

9         MR. STAFFORD:  -- ask the Court to set conditions

10  of release.  And I think there are combination of conditions

11  of release the Court can set.  That's my argument.

12         THE COURT:  All right.  Mr. Baker, in considering

13  the Government's request to detain you until trial, I'm

14  guided by several principles.

15         First, you are entitled to the presumption of

16  innocence.  That means that nothing that's happened in

17  today's hearing or anything I might say in my findings will

18  affect that presumption.

19         Instead, today's hearing serves a limited purpose

20  of determining whether you can be released or rather will be

21  detained until trial.

22         Second, under The Bail Reform Act, pretrial

23  detention is an exceptional step.  Under the Act, a

24  defendant must be released until trial -- before trial,

25  unless I find that there's no condition or combination of

1   conditions that exist that will reasonably assure the

2   defendant's appearance in the case or reasonably assure the

3   safety of any other person or the community.

4          The Act also requires that the least restrictive

5   conditions be imposed that are necessary to provide those

6   assurances.

7          If, however, I can't find that there's any

8   condition or combination of conditions that will reasonably

9   assure your appearance in the case or reasonably protect the

10  safety of other persons in the community, then the Act does

11  require that I order you be held in custody.

12         In this case, due to the nature of the charges in

13  -- against you in the indictment, there is a presumption

14  supporting your detention pending trial, both on -- as a

15  risk of nonappearance and a risk of danger to the community.

16         And in this case, even assuming that you have

17  rebutted the presumption -- and I certainly do find you

18  rebutted the presumption with respect to at least a risk of

19  nonappearance -- I find that the record presented at today's

20  hearings indicate that you must still be detained until

21  trial as a danger to the community.

22         First of all, the nature and circumstance of the

23  charged offenses are very serious.  They involved assault in

24  a public location of an individual who was then subsequently

25  shot and killed.

1        And although the Government is not maintaining

2   that you are the one who pulled the trigger, at least at

3   this time, it is clear from the video evidence that you were

4   a participant of the assault of the individual who was then

5   murdered.

6        The way -- the evidence given the Officer Lyons's

7   testimony appears to be substantial:  a lot of video

8   evidence, discussions with others, witnesses at the scene

9   and the like.

10        But ultimately the history and characteristics,

11   particularly your criminal history, weighs in favor of your

12   detention.

13        Specifically, you have a long criminal history of

14   multiple offenses, including prior felony convictions,

15   multiple instances where you possessed prohibited weapons.

16        And most troublingly, while you were on parole as

17   a prior convicted felon, you were then found in possession

18   of firearms, which is a new violation of federal law.

19        And this gives me no indication that you would

20   abide by any restrictions that I could impose necessary to

21   protect the public.

22        You know, obviously there's a reason why Congress

23   enacted a statute prohibiting prior convicted felons from

24   having firearm, because it inherently raises a danger to the

25   community.

1          And firearms were found not just in 2020 during

2     the first search of your home that led to a parole

3     violation, but then again most recently when you were

4     arrested under this indictment.

5          And so there's a persistent pattern of

6     disregarding restrictions on your possession of firearms.

7          You know, I don't doubt your wife's sincerity in

8     her support of you, which I find commendable.  But even she

9     admits that she can't control your conduct.

10          She was fully aware that you're not allowed to

11     have firearms, but there they were found in your residence,

12     your common residence anyway.

13          In addition, you know, the ongoing use of drugs

14     also poses an inherent danger.  It's also a violation of

15     law.

16          And it's apparent that you were able to hide at

17     least the extent of your drug use, even from your own wife

18     while living under the same roof.

19          And so I don't find that she would be able to

20     police your conduct or exercise sufficient influence to

21     ensure that you abided by any conditions of release.

22          For those reasons I'm ordering you be detained

23     until trial.

24          All right.  Has Mr. Baker been arraigned?

25          MR. STAFFORD:  Has been what?

1          THE COURT:  Yes, arraigned?

2          MR. BLACK:  Yes.

3          MR. STAFFORD:  Yes, he has.

4          THE COURT:  Okay.

5          MR. BLACK:  Yes, ma'am.

6          THE COURT:  Okay.  So you have a schedule for the

7   case, right?

8          MR. BLACK:  We do.

9          THE COURT:  All right.  Anything else that we can

10  do for Mr. Baker today?

11         MR. BLACK:  No, Your Honor.

12         MR. STAFFORD:  No, ma'am.

13         THE COURT:  All right.  Thank you very much.

14         MR. STAFFORD:  Thank you, Judge.

15         THE COURT:  You are excused.  And we are adjourned

16  until is it 2:00?  Okay.  Thanks.

17      (Proceeding adjourned at 11:06 a.m.)

18                     * * * * *

19          *I certify that the foregoing is a correct

20  transcript to the best of my ability produced from the

21  electronic sound recording of the proceedings in the above-

22  entitled matter.*

23  */S/ MARY D. HENRY*
    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*
24  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*
    *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*
25  *JTT TRANSCRIPT #69718        DATE FILED:  APRIL 30, 2025*